1

2                                                    **E-Filed 8/18/09**

3

4

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**

9        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN JOSE DIVISION**

11

FERNANDO DOMINGUEZ,                    Case Number C 07-2241 JF

12                    Petitioner,         ORDER[1] DENYING PETITION FOR
                                          WRIT OF HABEAS CORPUS
13            v.

14   TOM FELKER,

15                    Respondent.

16

17        In 2001, Petitioner Fernando Dominguez ("Dominguez") was convicted in the San Benito

18   Superior Court of (1) rape, Cal. Pen. Code § 261(a)(2); (2) kidnapping for rape, Cal. Pen. Code §

19   209(b) (formerly Cal. Pen. Code § 208(d)); and (3) murder, Cal. Pen. Code § 187.  In 2004, the

20   California Court of Appeal affirmed the rape conviction but reversed the kidnapping-for-rape

21   conviction for insufficient proof of asportation and reversed the murder conviction because of

22   incomplete instructions on felony-murder accomplice liability.  *People v. Dominguez*, 13 Cal.

23   Rptr. 3d 212 (Ct. App. 2004).  The California Supreme Court granted Respondent's petition for

24   review and remanded the matter to the appellate court for reconsideration in light of *People v.*

25   *Cavitt*, 33 Cal. 4th 187 (2004) and *People v. Johnson*, 26 Cal. 3d 557 (1980).  On remand, the

26   Court of Appeal again reversed the murder and kidnapping convictions.  22 Cal. Rptr. 3d 249

27   _____

28        [1] This disposition is not designated for publication in the official reports.

Case No. C 07-2241 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC1)

1    (Ct. App. 2004).  In 2005, the California Supreme Court again granted review, and on August 28,

2    2006, it reversed the Court of Appeal, unanimously affirming Petitioner's convictions in all

3    respects.  39 Cal. 4th 1141 (2006), *cert. denied*, 127 S. Ct. 1491 (2007).

4        On April 24, 2007, Petitioner filed the instant petition for writ of habeas corpus.  On

5    November 20, 2007, this Court ordered Respondent to answer the petition, and on March 23,

6    2009, the Court granted Petitioner's request for oral argument.  A hearing was held on May 22,

7    2009.  Having considered the record, the briefing and the arguments presented at the hearing, and

8    for the reasons set forth below, the petition will be denied.

9                          **I. BACKGROUND AND PROCEDURAL HISTORY**

10       A.  Facts

11       Early in the morning of August 23, 1997, Officer Edward Escamilla ("Escamilla") was on

12   patrol in Hollister, California when he encountered Irma Perez ("Perez") on the side of the road

13   with three men, including Petitioner and Lionel Salcedo ("Salcedo").  The identity of the third

14   individual was not ascertainable at that time because that person wandered away from the scene

15   when Escamilla approached.  Perez appeared intoxicated, but when Escamilla questioned Perez

16   about her condition, she responded that she was fine and that the group was waiting for a taxi.

17   After running a warrant check, Escamilla released the group.  Escamilla subsequently witnessed

18   Petitioner, Salcedo and Perez entering a taxi.  Rafael Gutierrez ("Gutierrez"), the driver of the

19   taxi, testified at trial that he picked up Perez and three men in Hollister at approximately 2:00

20   a.m.  He drove them to a nearby labor camp, where two of the men exited the cab.  When no one

21   volunteered to pay the fare, Gutierrez started to drive back to town with the third man and Perez

22   still in the cab.  The third man then paid the fare, and Gutierrez left him and Perez on the side of

23   the road.  Gutierrez observed that after exiting the taxi, Perez began to walk in the direction of

24   Hollister, away from the labor camp, and that the individual who paid the fare then exited the

25   taxi and followed Perez.  After pausing to write in his logbook, Gutierrez drove back to town,

26   passing Perez and the third man, who at that point almost had caught up to Perez.  Gutierrez also

27   witnessed one of the men who had exited the taxi at the labor camp walking toward Perez's

28   location from the direction of the camp.

                                              2

1   Several days later, a tractor driver unearthed Perez's partly-clad body in a walnut orchard
2   approximately 250 feet from the road.  The victim was naked from the waist down; her brassiere
3   was pulled up over her chest, and another piece of clothing was wrapped around her neck.  Police
4   discovered drag marks in the soil, which suggested that the victim had been dragged from a point
5   near the road into the orchard.  At trial, one officer testified that he had observed two sets of shoe
6   prints alongside the drag marks, suggesting that two people had dragged Perez into the orchard.
7   Near a corner of the orchard, approximately twenty-five feet from the road and in an
8   embankment ten to twelve feet below the surface of the road, the police found a shallowly buried
9   pair of blue jeans together with underwear and a sock.  A distance of about fifty feet separated
10  the clothing from the beginning of the drag marks.  The victim's shoes also were found in the
11  orchard.

12  The ensuing police investigation revealed that on the night in question the victim had
13  been seen at the Smokehouse Bar in Hollister with Petitioner, Salcedo, and a third man, Jose
14  Martinez ("Martinez").  Officers then visited the labor camp where Petitioner and Martinez were
15  known to live, only to find had the men had left that day and not returned.  The two men were
16  located that night, walking on a remote road.  Upon questioning, Petitioner initially gave police a
17  false name.  He later admitted his identity but denied any having any knowledge about Perez.
18  Police then arrested Petitioner, who then gave a series of what he later admitted were false
19  accounts concerning his interactions with the victim.  Petitioner initially acknowledged that he
20  had been with Perez on the night in question, but he denied having intercourse with her or
21  knowing anything about her death.  He later stated that they had engaged in intercourse but
22  asserted that Perez had consented.  During trial, Petitioner maintained his position that Perez had
23  consented to have intercourse with him.

24  The forensic evidence contradicted Petitioner's version of events.  Analysis revealed that
25  Perez had been beaten and choked to death and that she had been forcibly raped, causing
26  substantial bruising to her posterior vaginal wall and cervix.  Semen from two different
27  individuals was found in her vagina.  DNA analysis identified one of the individuals as Carlos
28  Quesada, the father of Perez's children, with whom she was living at the time.  The other sample

3

1   belonged to Petitioner.  At trial, Quesada testified that he had engaged in consensual intercourse

2   with the victim during the morning of the day in question.  Martinez was excluded as a possible

3   donor, and before trial he died of natural causes.

4           B.  Trial and Conviction

5           At trial, Petitioner testified in his own defense.  He asserted that after exiting the taxi he

6   walked with the victim along the road, expressing his desire to have sex.  He further testified that

7   she demurred at first, saying that she did not know him.  According to Petitioner, the victim

8   eventually relented, and they had intercourse off the side of the road.  Then, after they had

9   finished, Martinez allegedly arrived on the scene.  Martinez apparently was upset by what he saw

10  and would not let Petitioner walk the victim home.  Petitioner then left Martinez and Perez

11  together and returned to the labor camp.  According to Petitioner, his testimony allowed the

12  inference that Martinez killed Perez in a jealous rage, outside Petitioner's presence.  In response,

13  the government argued that Petitioner personally had kidnapped, raped, and murdered the victim,

14  and that it was possible that Martinez had aided Petitioner in one or more of these acts.  During

15  closing argument, the prosecutor contended that Petitioner's version of events should be

16  discounted in light of the multiple misrepresentations he had made to police, and the fact that

17  Petitioner's story had shifted as additional adverse evidence was uncovered.

18          The trial court instructed the jury with CALJIC Nos. 8.10 and 8.21, which are the

19  standard instructions defining first-degree felony murder.  Instruction No. 8.10 read as follows:

20          The defendant is accused in Count 1 of the information of having
            committed the crime of murder in violation of Penal Code section
21          187.  Every person who unlawfully kills a human being during the
            commission or attempted commission of rape is guilty of the crime
22          of murder in violation of section 187 of the Penal Code.

23  Instruction No. 8.21 stated as follows:

24          In order to prove this crime, each of the following elements must
            be proved:  the human being was killed and the killing occurred
25          during the commission or the attempted commission of the crime
            of rape.
26
            The unlawful killing of a human being, whether intentional or
27          unintentional or accidental which occurred during the commission
            or attempted commission of the crime of rape is murder in the first
28          degree when the perpetrator had a specific intent to commit the

                                              4

1
2

crime.  Specific intent to commit rape and the commission or attempted commission of such crime must be proved beyond a reasonable doubt.

3   Petitioner also requested an aiding and abetting instruction as well as CALJIC No. 8.27,

4   which addresses the felony-murder liability of offenders who aid and abet in the felony but do

5   not participate in the killing.  At the time of trial, CALJIC No. 8.27 stated in pertinent part as

6   follows:

7
8
9
10
11

If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of [rape], all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental.

12   For reasons not evident from the record below, the trial court did not give aiding and abetting

13   instructions or CALJIC No. 8.27.  After reading the jury instructions, the trial court asked:

14   "Counsel, do you agree that I have read all the instructions that we agreed upon?"  Both the

15   prosecutor and defense counsel answered in the affirmative.

16   After the jury had deliberated for nearly a day, it sent two notes to the court.  One note

17   stated, "Elements.  [¶] 1. A human being was killed. [¶] 2. Murder occurred."  The second stated:

18
19
20

We are unclear of the criteria of the statute.  To find Dominguez guilty of felony murder ([Penal Code § 187).  Did Dominguez only need to be present at the time of [Perez's] death, or did he need to kill her himself[?]  We are clear about the rape element of the crime.

21   The trial court responded with a handwritten note, stating: "I cannot offer anything more

22   than the wording of [instructions] 8.10 and 8.21 which I previously read."  The record contains

23   no indication that the court consulted with counsel from either side before responding to the

24   jury's inquiry.  Approximately one hour after the trial court's response to the inquiry, the jury

25   returned with a guilty verdict.

26   Petitioner filed a timely appeal.  His primary contentions in support of reversal were (1)

27   the trial court committed reversible error by failing to provide instructions pursuant to CALJIC

28   No. 8.27 in response to the jury's note; (2) the trial court should have provided instructions *sua*

5

*sponte* concerning the defense described in *People v. Mayberry*, 125 Cal. Rptr. 745 (1975), which held that a defendant lacks the requisite intent to commit rape if he has a "reasonable and bona fide belief" that the victim had consented voluntarily to the act of intercourse; and (3) the facts where insufficient to support the kidnapping conviction because any forced movement of the victim was minimal and incidental to the act of rape.

C. Reversal on First Appeal

1. Failure to provide instructions in accordance with CALJIC No. 8.27

On Petitioner's first direct appeal, the state appellate court concluded that the instructions were "wholly inadequate to apprise the jury of the principles germane to the evidence and issues before it." 13 Cal. Rptr. 3d at 217. Acknowledging that "the felony murder rule makes the perpetrator of an enumerated offense automatically guilty of murder when he personally causes the death of another in the course of committing the target offense," *id*. at 217-18, the court took issue with the fact that the jury received "no instruction whatsoever" with respect to the "complicity" prong of the felony murder rule, pursuant to which culpability also is extended to "to all persons jointly engaged at the time of such killing in the perpetration of or an attempt to perpetrate the when one of them kills while acting in furtherance of the common design." *Id.* at 218 (citations omitted). According to the state appellate court, the jury was not given the option of considering a scenario in which Petitioner raped the victim but did not participate in a later and separate act that resulted in her murder. *See id.* ("the instruction places no restriction whatsoever on felony murder culpability, but makes the defendant guilty for any 'killing' that occurs 'during' the commission of the predicate offense. Contrary to the People's argument, culpability for felony murder does not extend so far when the defendant himself is not the killer…it is clear that for a nonkiller to be guilty of felony murder, more is required than that he and the killer cooperate at some point in perpetrating a predicate offense."). The state appellate court held further that the error was compounded when the jury asked for clarification and none was provided. *Id.* at 220 ("[A] court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least consider how it can best aid the jury.") (citation omitted).

In opposition to Petitioner's arguments, the state contended that the trial court's failure to

6

provide the requested instruction was harmless error, because the evidence presented at trial

established that the rape and subsequent murder were part of a "continuous transaction."  13 Cal.

Rptr. 3d at 221.  The state appellate court disagreed, commenting that:

> [I]f the jury was not convinced that defendant was the killer, it
> might well have been unable to find the requisite nexus, or any
> nexus, between his conduct and the killing.  The jury knew that the
> victim was last seen in the presence of two men, presumably
> defendant and Martinez.  It knew that she was brutally beaten and
> that she was sexually penetrated with great force.  It found that
> defendant, who admittedly had sexual relations with her,
> committed the crime of rape.  It does not follow that if Martinez
> killed her, he did so as a result of, in furtherance or, or while
> jointly engaged in, defendant's rape of Ms. Perez, or that he did so
> while defendant was assisting him in an attempted rape.  The jury
> could have believed, and the jury's question implied, that Martinez
> might have killed her during a separate, subsequent assault in
> which defendant did not participate.  Nor need the assault have
> been sexual in nature; Martinez might have killed her, as
> defendant's testimony might be understood to imply, in a fit of
> jealous rage.  In any of these scenarios the jury might have found
> that the killing was independent of any felony committed (or aided
> and abetted) by defendant.

*Id*. at 221.

## 2.  *Mayberry* Defense Instruction

The *Mayberry* defense is embodied in CALJIC No. 10.65, and reads in relevant part as

follows:

> There is no criminal intent if the defendant had a reasonable and
> good faith belief that the other person voluntarily consented to
> engage in [sexual intercourse]…Therefore, a reasonable and good
> faith belief that there was voluntary consent is a defense to such a
> charge…unless the defendant thereafter became aware or
> reasonably should have been aware that the other person no longer
> consented to the sexual activity.
>
> However, a belief that is based upon ambiguous conduct by an
> alleged victim that is the product of conduct by the defendant that
> amounts to force, violence, duress, menace, or fear of immediate
> and unlawful bodily injury on the person of the alleged victim or
> another is not a reasonable good faith belief.
>
> If after a consideration of all of the evidence you have a reasonable
> doubt that the defendant had criminal intent at the time of the
> accused sexual activity, you must find [him]…not guilty of the
> crime.

The state has the burden of proving beyond a reasonable doubt that the defendant did not actually

7

1    and reasonably believe that the victim consented to the act of intercourse.  *See Dominguez*, 47

2    Cal. Rptr. 3d at 580 n.4.

3           In his direct appeal, Petitioner argued that the trial court should have provided a

4    *Mayberry* instruction to the jury *sua sponte*.  The state appellate court rejected this argument.

5    Noting that "the trial court has a *sua sponte* duty to instruct on defenses where there is substantial

6    evidence to support the instruction," 13 Cal. Rptr. 3d at 223, it held that there was a complete

7    lack of evidence supporting Petitioner's theory of consent.  *Id*. ("There was no evidence that Ms.

8    Perez gave an ostensible but ineffectual consent.").  In addition, if the jury had found that there

9    had been consent, it would not have found the Dominguez guilty of rape because such a charge

10   requires "an act of sexual intercourse with another 'against that person's will by means of force,

11   violence, duress, menace, or fear of immediate and…unlawful bodily injury." *Id*. (citation

12   omitted).  Moreover, if the jury had believed Dominguez's testimony—according to which there

13   was clear manifestation of consent—there would be no reason to find that she acted in a manner

14   that clearly indicated consent but in reality she was resisting the act.  *See id.* at 224 ("if the jury

15   believed that this conduct constituted an outward manifestation of consent, by itself or with other

16   evidence, then it had no basis to reject the defense theory of actual consent.").

17                    3.  Insufficient Evidence to Support Kidnapping Conviction

18          The state appellate court agreed with Petitioner that the record did not support the

19   conviction for kidnapping.  The trial court instructed that kidnapping for rape "consists in

20   relevant part of the unlawful movement of a person, by force or fear, 'for a substantial distance

21   where the movement is not merely incidental to the commission of the rape and where the

22   movement substantially increases the risk of harm to the person over and above that necessarily

23   present in the crime of rape itself.'" 13 Cal. Rptr. 3d at 227 (citation omitted).  After a lengthy

24   analysis of the meaning of "incidental" (and suggesting that the term may need to be clarified by

25   the California Legislature), the state appellate court concluded that the movement of the victim of

26   a mere ten to twelve feet away from the roadway, which apparently would have little effect on

27   the potential visibility of the act, did not support the allegation that a separate act of kidnapping

28   was necessary to effect the crime of rape.  *See id.* at 234 ("Ms. Perez was not forced into an

8

1    enclosure which concealed her from public view.  Instead of being taken from a position of very

2    high public visibility to very low visibility…Ms. Perez was moved from a location with little

3    chance of observation to one with a marginally lower chance…there is no evidence that, at the

4    time of the asportation, defendant intended any further harm to the victim than is inherent in the

5    offense of rape.").

6          D.  California Supreme Court Order and Subsequent Court of Appeal Decision

7          Following Petitioner's success on his first direct appeal, the California Supreme Court

8    vacated the state appellate court's decision with instructions to reconsider the case in light of

9    *Cavitt* and *Johnson*.[2]  *Cavitt* instructed that the "purpose of the felony-murder rule is to deter

10   those who commit the enumerated felonies from killing by holding them strictly responsible for

11   any killing *committed by a cofelon*, whether intentional, negligent, or accidental, during the

12   perpetration or attempted perpetration of the felony."  *Dominguez*, 39 Cal.4th at 1159 (quoting

13   *Cavitt*, 33 Cal. 4th at 197) (emphasis in original).  There is no need to find a "very specific causal

14   relationship" between the murder and the underlying felony.  *See Cavitt*, 33 Cal. 4th at 197-98.

15   "Indeed, the felony-murder rule is intended to eliminate the need to plumb the parties' peculiar

16   intent with respect to a killing committed during the perpetration of the felony.  *Id*.  The felony

17   murder rule thus requires only a "logical nexus" between the felony and the resulting homicide.

18   *Id*. at 199.  Moreover, a "logical nexus" is not a required element of the crime but rather is a

19   "clarification of the scope of an element."  *Id*. at 203.  When there is a clear logical nexus

20   between the murder and the felony, no duty is imposed upon the trial court to clarify the meaning

21   of the term.  Instead, it is the defense's obligation to ask for additional instructions.  *See id*. at

22   204 ("if the requisite nexus between the felony and the homicidal act is not at issue and the trial

23   court has otherwise adequately explained the general principles of law requiring a determination

24   whether the killing was committed in the perpetration of the felony, 'it is the defendant's

25

26          [2] *Johnson* "reaffirm[ed]" the standard of review in California for a criminal conviction:
27   "the court must review the whole record in the light most favorable to the judgment below to
     determine whether it discloses substantial evidence—that is, evidence which is reasonable,
28   credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty
     beyond a reasonable doubt."  26 Cal. 3d at 578.

9

1  obligation to request any clarifying or amplifying instructions on the subject.'") (citation

2  omitted).

3          On remand, the state appellate court again found that there had been reversible error,

4  holding that "[u]nder *Cavitt*, the jury should have been instructed that in order to convict

5  defendant of felony murder based on a killing perpetrated by Martinez, jurors had to find beyond

6  a reasonable doubt both a causal connection and a temporal one between the felony committed or

7  attempted by defendant, and the killing." *Dominguez*, 22 Cal. Rptr. 3d at 256.  It found that the

8  question posed by the jury went beyond whether there was a logical nexus, either temporally or

9  spatially, but rather whether it needed to consider a "causal" element between Petitioner's

10  presence and the subsequent murder.  *See id.*  According to the state appellate court, the jury may

11  have been considering that Petitioner was innocent with respect to the homicide but was

12  prevented from making that finding because it did not have guiding instructions that would

13  comport with such a conclusion:

> We must assume that the jury was led to ask this question not by
> idle curiosity, but by a failure on the part of the prosecution to
> persuade one or more jurors that defendant had anything to do with
> the killing beyond being present.  Under *Cavitt*, of course, neither
> of the alternatives posited by the jury correctly stated the law.
> Defendant did not have to kill the victim himself, but neither could
> he be convicted based on mere presence at the scene. The jury's
> question thus revealed that it was contemplating two factual
> scenarios, one compatible with guilt and one not.  The question
> itself raises a strong possibility that the jury ultimately adopted the
> scenario inconsistent with guilt, and yet returned a guilty verdict.
> That possibility alone precludes a finding of harmless error.

*Id.* at 256-57.  In addition, the state appellate court reaffirmed its earlier rulings with respect to

the *Mayberry* defense and the kidnapping conviction.  *Id.* at 274.

          E.  California Supreme Court Decision

          On review, the California Supreme Court again disagreed with the state appellate court's

conclusions with respect to the asportation requirement and felony-murder instructional issues.[3]

_____

[3] The court quickly disposed of Petitioner's argument that the trial court had a duty to
issue a *Mayberry* instruction *sua sponte*, because Petitioner had not relied on such a defense at
trial and there was no evidence to support such a defense. Instead, it found that Petitioner's
defense had been one of "consent in fact." *Dominguez*, 39 Cal. 4th at 1147.  Because a trial court

Case No. C 07-2241 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC1)

1   With respect to the kidnapping conviction, the court stated that the applicable test for a charge of

2   aggravated kidnapping was "clear":  "the victim must be forced to move a *substantial distance*,

3   the movement cannot be merely *incidental* to the target crime, and the movement must

4   *substantially increase* the risk of harm to the victim." *Dominguez*, 39 Cal. 4th at 1153 (emphasis

5   in original).  Because the test does not rely on quantitative parameters, the resolution of each case

6   "will necessarily depend on the particular facts and context of the case." *Id*.  Finding that the

7   trial court had instructed the jury properly, the Supreme Court reversed the Court of Appeal with

8   respect to its interpretation of the facts:  "Defendant forced the victim in the middle of the night

9   from the side of the road to a spot in an orchard 25 feet away and 10 to 12 feet below the level of

10  the road.  Though the distance is not great, an aerial photograph of the scene confirms the victim

11  was moved to a location where it was unlikely any passing driver would see her." *Id*. at 1153.

12  Such asportation was not incidental to the crime of rape.  *See id.* ("The movement thus changed

13  the victim's environment from a relatively open area alongside the road to a place significantly

14  more secluded, substantially decreasing the possibility of detection, escape or

15  rescue…defendant's movement of the victim down an embankment and into an orchard cannot

16  be said to have been merely incidental to the rape.).

17      With respect to the failure to instruct on non-killer complicity, the Supreme Court

18  determined—despite the government's concession that for purposes of appeal there should have

19  been an instruction—that such failure constituted only harmless error.  *Dominguez*, 39 Cal. 4th at

20  _____

21  is obligated to give a particular instruction "only if (1) it appears that the defendant is relying on

22  such a defense, or (2) if there is substantial evidence supportive of such a defense and the defense
    is not inconsistent with the defendants theory of the case," *id.* at 1148 (citation omitted), an

23  instruction was not required because neither requirement had been met.  Trial counsel only

24  argued that Petitioner "had voluntary sex with this lady" and that the jury should find that there
    had been consent.  *Id*.  There was no reliance on a theory where Petitioner *thought* the act had

25  been voluntary but in reality the victim had not given consent.  In addition, a successful
    *Mayberry* defense requires that objective circumstances would indicate consent as well as a

26  subjective showing that the defendant "honestly and in good faith, albeit mistakenly, believed
    that the victim consented to sexual intercourse" because of "equivocal" conduct on the part of the

27  victim. *Id*.  The California Supreme Court concluded that there was no evidence that the victim's
    conduct was equivocal in any way, and the evidence of trauma to the victim's pelvic area negated

28  any inference that the act had been voluntary. *Id.* at 1149.

11

1   1160.  In addition, the court found that the error was harmless under either the state law standard

2   of review, *see People v. Watson*, 46 Cal. 2d 818, 836 (1956), or under the more stringent

3   constitutional test of harmless error beyond a reasonable doubt as set forth in *Chapman v.*

4   *California*, 386 U.S. 18, 24 (1967).  *See id.*  The court stated:

> The evidence demonstrated the victim was beaten before she was
> raped.  The evidence also showed she was killed the night she was
> raped, on or near the spot where defendant kidnapped and raped
> her.  Footprint evidence suggested two persons dragged the victim
> from the embankment next to the road into the orchard, where her
> body was eventually found.  Finally, it was uncontradicted that
> defendant and Martinez fled their home in the labor camp
> immediately after the victim's body was discovered, and that
> defendant told several lies to police when questioned…
> Accordingly, even had the trial court instructed the jury with
> CALJIC No. 8.27 in response to its question, the jury would
> necessarily have concluded defendant was liable for murder, either
> as the direct perpetrator or under the felony-murder rule applicable
> to nonkilling cofelons.

*Id.*

## II.  STANDARD OF REVIEW

The provisions of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) govern

this case.  *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (en banc).  Under AEDPA, when

reviewing a state criminal conviction, a federal court may grant a writ of habeas corpus only if a

state court proceeding "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  28

U.S.C. § 2254(d).

## III.  DISCUSSION

A.  Failure to Provide *Mayberry* Defense Instructions

As he did on his direct appeal, Petitioner contends that the trial court erred by failing to

instruct the jury as to the so-called *Mayberry* defense, *i.e.*, that a reasonable though mistaken

belief that the victim consented to the act is a defense to a charge of rape.  *See Mayberry*, 15 Cal.

3d at 157.  *See also People v. Williams*, 4 Cal. 4th 354, 360 (1992) ("a defendant's reasonable

12

1    and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to

2    rape.").  The jury must be instructed on the defense if there is "substantial evidence of equivocal

3    conduct that would have led a defendant to reasonably and in good faith believe consent existed

4    where it did not." *Williams*, 4 Cal. 4th at 362.

5    Under applicable Ninth Circuit precedent, however, failure to instruct on an affirmative

6    defense entitles a petitioner to federal habeas relief *only if* the defense was supported by

7    *substantial* evidence.  *See Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).  "The fact that a

8    jury instruction violates state law is not, by itself, a basis for federal habeas corpus relief." *Id.*

9    Instead, the error must be one that was so serious as to affect the entire proceeding, thereby

10   threatening due process. *Id*. "Failure to instruct on the defense theory of the case is reversible

11   error if the theory is legally sound and evidence in the case makes it applicable." *Beardslee v.*

12   *Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)  "The burden on the habeas petitioner is 'especially

13   heavy'" when the alleged error was the failure to give an instruction. *Clark*, 450 F.3d at 904.

14   In the instant case, Petitioner has not shown that the absence of a *Mayberry* instruction

15   infected the entire proceeding.  Petitioner's exculpatory theory was actual consent.  He did not

16   request a *Mayberry* instruction during trial.  "[A] California trial court has no *sua sponte*

17   obligation to instruct on a particular defense unless "it appears that the defendant is relying on

18   such a defense." *People v. Barton*, 12 Cal. 4th 186, 195 (1995) (quoting *People v. Sedeno*, 10

19   Cal. 3d 703, 716 (1974)).  Under California law, there must be a substantial evidentiary basis in

20   the record to support a defense in order to require an instruction. *Id.* at 195 (instruction is

21   required only "if there is substantial evidence supportive of such a defense and the defense is not

22   inconsistent with the defendant's theory of the case.") (citation omitted).  As the California

23   Supreme Court observed, Petitioner's testimony at trial was that the victim initially did not want

24   to have intercourse but then relented and clearly gave consent.  There was no evidence of

25   equivocal conduct, nor did defense counsel argue during closing argument that Petitioner was

26   misled by the victim. *See Dominguez*, 39 Cal. 4th at 1148 ("The right to a *Mayberry* instruction

27   in the absence of a request thus depends on whether the defendant has proffered 'substantial

28   evidence that the defendant honestly and reasonably, but mistakenly, believed that the victim

13

1   consented to sexual intercourse.'") (quoting *People v. Williams*, 4 Cal. 4th 354, 361 (1992)).  The

2   uncontroverted evidence presented at trial showed that there was severe trauma to the victim's

3   pelvic region, and she was found in a disheveled state of undress.

4        B.  Asportation Requirement under Former § 208(d)

5        Petitioner next contends that the California Supreme Court erred by retroactively applying

6   an interpretation of the applicable criminal statute to the facts his case, thus violating the holding

7   of the United States Supreme Court in *Bouie v. City of Columbia*, 378 U.S. 347 (1964), and that

8   even under the current interpretation of the statute, the evidence before the jury was insufficient

9   to support a conviction for aggravated kidnapping.

10        1.  *Bouie* Error

11       It is a due process violation to apply a judicial construction of a statute in a manner that is

12  "unexpected and indefensible by reference to the law which had been expressed prior to the

13  conduct in issue."  *See Bouie*, 378 U.S. at 354 (citation omitted).  At the time of the alleged

14  offense, Cal. Penal Code § 208(d) provided that a person committed a crime when he

15  "kidnapped" someone with the intent to commit rape.  "Asportation" of the victim is an element

16  of the offense.  *People v. Rayford*, 9 Cal. 4th 1, 11 (1994).  Petitioner argues that in 1997, when

17  the events in question occurred, it was settled under California law that asportation of any

18  distance less than ninety feet was insufficient to sustain a conviction for simple kidnapping under

19  § 207.  In support of his *Bouie* argument, Petitioner cites *People v. Martinez*, 20 Cal. 4th 225

20  (1999), which expressly overruled "cases holding that specific distances failed to establish

21  asportation." *Id*. at 239.

22       While *Martinez* involved a charge of simple kidnapping rather than kidnapping with

23  intent to commit rape, Petitioner contends that the asportation element of § 208(d) prior to

24  *Martinez* must have been least as stringent as that for a charge of simple kidnapping because (1)

25  simple kidnapping is a lesser included offense of kidnapping for the purpose of rape and (2) a

26  lesser included offense must, by definition, contain all of the elements of the greater offense.  *See*

27  *People v. Pearson*, 42 Cal. 3d 351, 355 (1986).  In *People v. Jackson*, 66 Cal. App. 4th 182

28  (1998), the defendant was convicted of violating former Penal Code § 208(d).  The state

14

1   appellate court held that simple kidnapping is a lesser included offense of kidnapping to commit

2   sodomy or oral copulation.  *Id.* at 189.  Petitioner posits that because kidnapping to commit rape

3   was described in the same statute as kidnapping to commit sodomy and oral copulation, it

4   therefore "is manifest" that simple kidnapping is a lesser included offense of kidnapping to

5   commit rape.

6        However, while there is some logic to Petitioner's argument on its face, the California

7   Supreme Court had taken the opposite view prior to the commencement of Petitioner's trial.  In

8   *People v. Rayford*, 9 Cal. 4th 1, 11 (1994), the court concluded, after an extensive review of the

9   legislative history, that " section 208(d) is a separate offense from, not an enhancement to,

10  section 207(a)."  Accordingly, at the time of Petitioner's acts "the standard of asportation for

11  section 208(d) kidnapping require[d] that the movement of the victim be for a distance which is

12  more than that which is merely incidental to the commission or attempted commission of rape,

13  oral copulation, sodomy, or rape by instrument, and that this movement substantially increase[d]

14  the risk of harm to the victim over and above that necessarily present in the commission or

15  attempted commission of these crimes."  *Rayford*, 9 Cal. 4th at 22.  This was the standard applied

16  by the trial court and by the California Supreme Court.  *See Dominguez*, 39 Cal. 4th at 1155.

17  There was no error under *Bouie*.[4]

18        Even assuming that Petitioner is correct with respect to the necessary inclusion of the

19  required elements for simple kidnapping, the California Supreme Court's decision in *Martinez*

20

21        [4] At best, whether simple kidnapping was a lesser included offense at the time of
    Petitioner's acts was an unsettled question.  *See Rayford*, 9 Cal. 4th at 14 (describing historical
22  relationship of simple kidnapping statute to its aggravated kidnapping brethren as "decidedly
    nonlinear"); *People v. Ek-Luna*, 2008 WL 2656166, at *11 (Cal. Ct. App. July 08, 2008)
23  (unpublished) ("There is no gainsaying the fact that California law governing the asportation
    element of kidnapping is not a model of clarity.").  Ultimately, the question of whether a distance
24  requirement for simple kidnapping charge under § 207 was incorporated into the aggravated
    kidnapping offenses described in the former § 208 requires an interpretation of state law.
25  However, there can be no federal claim for habeas relief where a dispute involves an
    interpretation of state law.  *See Bradshaw v. Rickey*, 546 U.S. 74 (2005) (per curiam) (state court
26  interpretation of state law presents no federal question for federal habeas review); *Mendez v.*
    *Small*, 298 F.3d 1154, 1157 (9th Cir. 2002) (state court has final word on the interpretation of its
27  own law).

28

                                            15

1  did not announce a relevant change in the applicable law.  Admittedly, at least several cases prior

2  to *Martinez* did suggest that a minimum distance was required to sustain a charge of simple

3  kidnapping.  For example, in *People v. Green*, 27 Cal. 3d 1 (1980), the California Supreme Court

4  held that the forced movement of a murder victim for a distance of ninety feet could not support

5  a simple kidnapping charge.[5]  *Id*. at 66-67.  Similarly, in *People v. Caudillo*, 21 Cal. 3d 562

6  (1978), the court held that unlike cases involving instructions of aggravated kidnapping, the

7  distance transported was the primary evidence to consider in determining whether a conviction

8  for simple kidnapping could stand.  *Id*. at 574 ("Neither the incidental nature of the movement,

9  the defendant's motivation to escape detection, nor the possible enhancement of danger to the

10  victim resulting from the movement is a factor to be considered in the determination of

11  substantiality of movement for the offense of kidnapping [under § 207].  Such factors would be

12  relevant in a…situation of aggravated kidnapping").

13       In 1999, however, the Supreme Court reversed the rule that distance was the dispositive

14  factor in a simple kidnapping case.  *See Martinez*, 20 Cal. 4th at 237 n.6 ("To the extent

15  *Caudillo*…prohibited consideration of factors other than actual distance in determining whether

16  the asportation was sufficient to constitute simple kidnapping, it is overruled.").  Reaffirming

17  "that factors other than actual distance are relevant to determining asportation [for aggravated

18  kidnapping] under section 208(b)," *id*. at 235, the court determined that such considerations also

19  are relevant cases brought under § 207 for simple kidnapping, thereby overruling cases such as

20  *Green* and *Caudillo*.  *See id*. at 235-37.  With respect to aggravated kidnapping, *Martinez*

21

22  ───────────────

   [5] *Green* considered whether a forced movement of ninety feet satisfied the requirement of

23  Section 207(a), which required, *inter alia*, that such movement be to "another part of the county."
   The court found as a matter of law that movement of ninety feet could not be movement to

24  another part of the county.  *See also People v. Brown*, 11 Cal. 3d 784, 789 (1974) (forcible
   movement of only seventy-five feet "did not constitute a forcible taking 'into another part of the

25  same county'").  Accordingly, the purported distance requirement may have arisen because § 207
   appears to support that some significant forced transportation must occur, *i.e.*, the perpetrator

26  must "carr[y] the person into another country, state, or county, or into another part of the same
   county."  In contrast, aggravated kidnapping requires that the perpetrator "kidnaps or carries

27  away" the victim.  This distinction may explain the temporary divergence in interpretation with
   respect to the asportation element.

28

Case No. C 07-2241 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC1)

1  reiterated the accepted rule: "aggravated kidnapping requires movement of the victim that is not

2  merely incidental to the commission of the underlying crime and that increases the risk of harm

3  to the victim over and above that necessarily present in the underlying crime itself." *Id.* at 232-

4  33 (citing *Rayford*, 9 Cal. 4th at 12, 22 and *People v. Daniels*, 71 Cal. 2d 1119, 1139 (1969)).

5  On Petitioner's direct appeal, the California Supreme Court rejected the argument that

6  *Green* and similar cases had established a bright-line distance requirement, and thus concluded

7  that *Martinez* did not announce a change in the applicable law. *See Dominguez*, 39 Cal. 4th at

8  1153-54 ("We reject defendant's simple syllogism because its premise fails.  At the time of

9  defendant's crime, it was not well established that under all circumstances simple kidnapping

10  required a movement of more than 90 feet.").  Without engaging in its own expansive review of

11  all the simple kidnapping case law prior to 1997, this Court concludes that the California

12  Supreme Court's statement was an accurate conclusion regarding the unsettled nature of the

13  distance requirement (if any) for § 207.  *See*, *e.g.*, *Rayford*, 9 Cal. 4th at 19 n.19 (noting

14  inconsistencies in case law with respect to determinative nature of distance requirement for

15  simple kidnapping cases).

### 2.  Substantial Evidence to Uphold Conviction

17  The test with respect to whether there is sufficient evidence to support a conviction is

18  whether "after viewing the evidence in the light most favorable to the prosecution, any rational

19  trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

20  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  This standard "must be applied with explicit

21  reference to the substantive elements of the criminal offense as defined by state law."  *Id.* at 324

22  n.16.  Pursuant to AEDPA, a federal court must apply the standards of *Jackson* with an additional

23  layer of deference.  *See Juan H. v. Allen*, 408 F.3d 1262, 1274-1275 (9th Cir. 2005) (citing 28

24  U.S.C. § 2254(d)).  As a result, this Court must ask whether the decision of the California

25  Supreme Court reflected an "unreasonable application" of the law.  *See id*.

26  Aggravated kidnapping requires (1) movement of the victim that is not "merely

27  incidental" to the commission of the underlying crime that (2) increases the risk of harm to the

28  victim over and above that necessarily present in the underlying crime itself.  *Martinez*, 20 Cal.

17

1    4th at 232.  These two requirements are not separate prongs but rather interrelated inquiries.  *Id*.

2    at 233.  With respect to the "merely incidental" determination, the jury should look to the "'scope

3    and nature' of the movement," including the actual distance moved.  *Id*. (citation omitted).  The

4    second requirement "refers to whether the movement subjects the victim to a substantial increase

5    in risk of harm above and beyond that inherent in [the underlying crime]."  *Id*. (quoting *Rayford*,

6    9 Cal. 4th at 13-14).  Factors to consider include "the decreased likelihood of detection, the

7    danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced

8    opportunity to commit additional crimes."  *Id*.  In sum, an aggravated kidnapping charge requires

9    that "the victim must be forced to move a substantial distance, the movement cannot be merely

10   incidental to the target crime, and the movement must substantially increase the risk of harm to

11   the victim."  *Dominguez*, 39 Cal. 4th at 1153.

12        Petitioner contests whether the evidence supports a finding that his forced asportation of

13   the victim was more than "merely incidental" to the underlying crime.  Specifically, he argues

14   that the movement down the embankment was to provide a "more comfortable" setting for the

15   act of intercourse.  In addition, Petitioner contends that intercourse on the roadway would be

16   unsafe, and thus he and the victim moved away from the road.

17        As the California Supreme Court observed, the "merely incidental" requirement is not a

18   phrase that invites a specific and defined set of quantitative parameters.  *Dominguez*, 39 Cal. 4th

19   at 1151 ("Whether a forced movement of a rape victim (or intended rape victim) was merely

20   incidental to the rape…is difficult to capture in a simple verbal formulation that would apply to

21   all cases.").  In analyzing the sufficiency of the evidence regarding the "more than incidental

22   movement" element, a California court is supposed to engage in "a multifaceted, qualitative

23   evaluation" of the scope and nature of the movement.  *Id.* at 1152.  This evaluation must also

24   take into consideration the interrelated, but separate, element of the offense that the risk of harm

25   to the victim must have been substantially increased by the movement.  *Id*.  While distance is a

26   factor, the "totality of the circumstances" for each case ultimately will determine culpability.  *Id*.

27   In the instant case, the California Supreme Court correctly determined that forcing of the victim

28   twenty-five feet down an embankment to an orchard that would obscure the view not only of

18

1    persons on the roadway but also of persons standing on the road looking down was more than

2    incidental to the act of rape.  Moving the victim off the roadway created substantial additional

3    risk to the victim and enabled Petitioner to proceed with the assault out of sight of traffic or

4    persons on the roadway.  Accordingly, there was no error.

5            C.  Failure to Provide Felony Murder Instruction

6            Petitioner argues that the trial court should have provided the jury with a felony-murder

7    instruction once it became evident that the jury may have been contemplating a scenario in which

8    Martinez killed the victim after Petitioner committed the rape.  Specifically, Petitioner contends

9    that the trial court failed to provide a required instruction with respect to the specific intent and

10   "engaged in commission" elements contained in CALJIC 8.27.  Petitioner argues that under the

11   standard of review set forth in *Neder v. United States*, 527 U.S. 1 (1999), the failure to provide

12   appropriate instructions constituted an error that was not harmless beyond a reasonable doubt.[6]

13           Under *Neder*, where the "jury's instructions preclude any consideration of evidence

14   relevant to the omitted element…harmless-error analysis is appropriate."  527 U.S. at 17-18.

15   "[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was

16   uncontested and supported by overwhelming evidence, such that the jury verdict would have

17   been the same absent the error, the erroneous instruction is properly found to be harmless."  *Id*. at

18   17.  In the instant case, Petitioner cannot argue that he contested the omitted element.  His

19   position at trial was that he did not commit either the rape or the murder, not that Martinez's acts

20   constituted an event severable from the rape (thus precluding liability under the felony-murder

21   rule).  In addition, the fact that any killing by Martinez was part of the same continuous act is

22   supported by overwhelming evidence.  Petitioner disputes this finding, contending that he raised

23   a sufficient factual dispute as to whether the rape and any subsequent killing by Martinez were

24   ───────────────

25           [6] The parties dispute whether the proper standard of review is harmless error beyond a
     reasonable doubt or the standard of review described in *Brecht v. Abrahamson*, 507 U.S. 619

26   (1993), which held that the appropriate standard of review on habeas corpus is "whether the error
     'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Id*. at 638.

27   For purposes of the instant analysis only, the Court will assume that the trial court omitted
     instructions regarding an element of the offense and thus will apply the more rigorous *Neder* test.

28

                                                   19

1   logically connected.  However, Petitioner's hypothetical scenario strains reason.  As discussed

2   above, the jury properly found that Petitioner (1) forcefully moved the victim from the road and

3   (2) raped her.  If Martinez was standing by while the rape occurred, there was no separate act if

4   or when he decided to kill the victim.  The only scenario that could support a legitimate basis for

5   reversal would be if Martinez came along long after the rape, after Petitioner left the scene.  This

6   is not the scenario that the jury was considering, and, more importantly, the evidence presented at

7   trial supports the opposite conclusion—that either Martinez or Petitioner (or both) killed the

8   victim, with the support and knowledge of the other, and that both men then dragged her into the

9   orchard in an attempt to cover their tracks.[7]

10          As with the asportation requirement for a kidnapping charge, the causal connection

11   required for a felony murder conviction has been the subject of various judicial definitions over

12   the years.  In *People v. Cavitt*, 33 Cal. 4th 187 (2004), the California Supreme Court provided

13   helpful clarification on this issue:

14                  California law thus has long required some logical connection
                    between the felony and the act resulting in death, and rightly so.
15                  Yet the requisite connection has not depended on proof that the
                    homicidal act furthered or facilitated the underlying felony.
16                  Instead, for a nonkiller to be responsible for a homicide committed
                    by a cofelon under the felony-murder rule, there must be a logical
17                  nexus, beyond mere coincidence of time and place, between the
                    felony the parties were committing or attempting to commit and
18                  the act resulting in death.

19   *Id.* at 201.  Evaluated under the *Cavitt* test, the evidence at trial overwhelmingly supports

20   Petitioner's conviction.  Petitioner argues, however, that a different standard applied in 1997, and

21   that prior to *Cavitt* the felony murder rule only covered acts that occurred "in furtherance of" an

22   underlying felony.  Petitioner thus attempts to drive a legal wedge between the rape and the

23   murder by arguing that there was little evidence that the killing occurred "in furtherance" of the

24

25          [7] Petitioner and the state appellate court consider the evidence of joint involvement to be
26   flimsy at best.  However, the California Supreme Court (and the jury, considering the verdict
     under the instructions given at trial) concluded otherwise.  This Court concludes that the record
27   does not support granting a writ based on a lack of factual evidence.  The decision by the
     California Supreme Court did not constitute "an unreasonable determination of the facts in light
28   of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Case No. C 07-2241 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC1)

1    underlying felony, in that if Martinez merely was present during the rape, the subsequent murder

2    was not committed in furtherance of the rape.  But as *Cavitt* explained, the "in furtherance"

3    element was a formulation of "different words to convey the same concept: to exclude homicidal

4    acts that are completely unrelated to the felony for which the parties have combined, and to

5    require instead a logical nexus between the felony and the homicide beyond a mere coincidence

6    of time or place."  *Id*.  Indeed, the instructions that were not given in the instant case are a

7    formulation of the "logical nexus" rule.  *See id.* at 203 ("[The CALJIC 8.27] instructions

8    adequately apprised the jury of the need for a logical nexus between the felonies and the

9    homicide in this case.").

10          Finally, Petitioner argues that the Court cannot surmise what the jury might have done

11   had the instruction been provided.  However, "where a defendant did not, and apparently could

12   not, bring forth facts contesting the omitted element, answering the question whether the jury

13   verdict would have been the same absent the error does not fundamentally undermine the

14   purposes of the jury trial guarantee."  *Neder*, 527 U.S. at 19.  Ultimately, the pertinent inquiry is

15   whether it is "clear beyond a reasonable doubt that a rational jury would have found the

16   defendant guilty absent the error?"  *Id.* at 18.  In the instant case, the answer is yes.

17                                              **IV.  ORDER**

18          Because the state court's determination was not contrary to, or an unreasonable

19   application of, clearly established Supreme Court precedent, nor was it based on an unreasonable

20   determination of the facts in light of the evidence presented, 28 U.S.C. § 2254(d)(1)-(2), this

21   Court concludes that Petitioner has failed to show any violation of his federal constitutional

22   rights in the underlying state court proceeding.  Accordingly, the petition for writ of habeas

23   corpus is DENIED.  The Clerk shall enter judgment and close the file.

24

25

26   DATED:  August 17, 2009

27

28
                                                    _____
                                           21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JEREMY FOGEL
United States District Judge

Case No. C 07-2241 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC1)

1   Copies of Order served on:

2   Edward Dallas Sacher      dallas@sdap.org

3   John H. Deist      John.Deist@doj.ca.gov, DocketingSFAWT@doj.ca.gov,
    susan.chiang@doj.ca.gov

4
    Peggy S. Ruffra      peggy.ruffra@doj.ca.gov, DocketingSFAWT@doj.ca.gov
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 07-2241 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC1)